**BOSSIER CHRYSLER–DODGE II, INC. d/b/a Bossier Country, Appellant,**

v.

**James RILEY, Appellee.**

**No. 10–05–00049–CV.**

Court of Appeals of Texas, Waco.

March 14, 2007.

Opinion Denying Rehearing April 25, 2007.

Rehearing Overruled May 15, 2007.

---

---

J. Bruce Bennett, Cardwell Hart & Bennett, LLP, William R. Crocker, Austin, for appellant.

Amy Grubbs, The Law Offices of Amy Grubbs Thomas, Mexia, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Bossier Chrysler–Dodge II, Inc. dba Bossier Country filed suit against James Riley alleging that Riley had breached the parties' contract by failing to deliver his Ford pick-up as a trade-in for a used PT Cruiser Riley had allegedly purchased. Riley counterclaimed alleging that Bossier Country committed fraud and DTPA violations. A jury refused to find that Bossier Country and Riley had a contract but did find that Bossier Country committed fraud and DTPA violations as alleged. The jury awarded Riley damages for these claims and awarded additional damages after finding that Bossier Country acted knowingly.

Bossier Country contends in five issues that: (1) there is no evidence or factually insufficient evidence that Bossier Country made a misrepresentation to Riley or failed to disclose information to him; (2) there is no evidence or factually insufficient evidence of detrimental reliance; (3) there is no evidence or factually insufficient evidence that Bossier Country acted knowingly; (4) the court erred by failing to cap the jury's award for mental anguish damages at three times the amount of economic damages awarded under section 17.50(b)(1) of the DTPA; and (5) the court erroneously calculated prejudgment and postjudgment interest at the rate of 10% per annum. We will modify the judgment to recite the correct rates of prejudgment and postjudgment interest and affirm the judgment as modified.

### Misrepresentation/Failure to Disclose

Bossier Country contends in its first issue that there is no evidence or factually insufficient evidence that it made a misrepresentation to Riley or failed to disclose information to him.

When we conduct a no-evidence review, we must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

When considering a factual sufficiency challenge ... regarding an issue on which the appellant did not have the burden of proof, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. We may not pass upon the witnesses' credibility or substitute our judgment for that of the [factfinder], even if the evidence would clearly support a different result. We will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. Reversal can occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof.

*Checker Bag Co. v. Washington,* 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied) (citations omitted).

■ "The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment." *Pulley v. Milberger,* 198 S.W.3d 418, 427 (Tex. App.-Dallas 2006, pet. denied); *Huynh v. Nguyen,* 180 S.W.3d 608, 615 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

Riley alleged that Bossier Country violated the DTPA by:

representing that an agreement conferred or involved rights, remedies, or obligations which it did not have or involve, or which are prohibited by law; and

failing to disclose information concerning goods or services which was known at the time of the transaction and such failure to disclose was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

*See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(12), (24) (Vernon Supp.2006).

Here, Riley testified that he went to Bossier Country on the morning in question looking for a more fuel efficient vehicle. Bossier Country salesperson Jason Banks helped Riley find a used PT Cruiser which he decided he wanted to buy. Banks and Riley negotiated a tentative agreement for Riley to buy the PT Cruiser for $15,999, for Bossier Country to give Riley $6,000 for his Ford pick-up, and for the balance to be financed for 36 months with monthly payments of $329. In accordance with this tentative agreement, Riley signed a Motor Vehicle Purchase Order ("MVPO") and a Conditional Sale and Delivery Agreement.

The MVPO does not contain any finance terms but provides in pertinent part:

THIS ORDER IS NOT A BINDING CONTRACT. DEALER SHALL NOT BE OBLIGATED TO SELL UNTIL APPROVAL OF THE TERMS HEREOF IS GIVEN BY A BANK OR FINANCE COMPANY WILLING TO PURCHASE A RETAIL INSTALLMENT CONTRACT BETWEEN THE PARTIES HERETO BASED ON SUCH TERMS. No contractual relationship is hereby created.

The Conditional Sale and Delivery Agreement likewise contains no finance terms. It provides in pertinent part:

> Buyer agrees to promptly complete the purchase of the vehicle if financing is approved in accordance with the terms described in the MVPO. Buyer may cancel this agreement to purchase at any time prior to receiving the notification of approval of financing. If financing is not approved on the proposed terms, Buyer has no obligation to purchase the vehicle.

Riley testified that, consistent with the quoted language, it was "specifically explained" to him that morning that under the terms of the Conditional Sale and Delivery Agreement he would be able to back out of the deal for the PT Cruiser.

Riley drove home to Marquez to get the title for his Ford. He returned to Bossier Country in the middle of the afternoon to finalize the purchase of the PT Cruiser. He was taken to Bossier Country's finance department where he signed additional paperwork.[1] First, he decided to purchase a service contract which would provide extended warranty coverage. To accommodate this purchase, the parties executed a second MVPO to include this additional expense.[2] This second MVPO also varies from the first because it lists Daimler-

Chrysler, LLC as the lien holder, while the first MVPO did not show a lien holder.

In addition, Riley signed a note payable to Bossier Country (the "Retail Installment Contract") to finance the purchase. The note requires 54 monthly payments of $321.68 and included a clause assigning the note to DaimlerChrysler. Riley testified that he did not read the installment contract before signing it because "they said it was just a standard contract." No one at Bossier Country explained to him that he would no longer be able to back out of the deal after signing the installment contract. Rather, Riley testified that he signed "this one because I was told I was safe to back out of the deal."[3]

Riley testified that after completing this paperwork he returned home in his Ford to clean out the tool box before trading it in. After talking with his wife Eva about the deal, he decided to not buy the PT Cruiser. Riley called Banks "the same afternoon" and "told him I had changed my mind about the deal."

The trial court admitted in evidence documentation offered by Riley which indicates that Bossier Country received notification at 6:02 p.m. that Riley was approved for financing at a term of 48 months. This notification indicated that DaimlerChrysler would finance $10,781.70, which was the

[1]. Riley's testimony regarding when he signed the various documents during his dealings with Bossier Country is somewhat confusing and sometimes contradictory. None of the witnesses whom Bossier Country called saw Riley sign each of the documents. The salesperson Banks filled out only the "foursquare" worksheet which set out the basic terms of the deal they were negotiating. The remainder of the paperwork was prepared in the finance department. Nevertheless, it may be reasonably inferred from Riley's testimony and that of the other witnesses that he signed the initial MVPO and the Conditional Sale and Delivery Agreement that morning and the remainder of the documents when he returned that afternoon.

[2]. The timing is unclear, but the parties actually completed three MVPO's. Two of them are virtually identical with the exception that one has a line drawn through it. These two MVPO's both reflect the bargain Riley and Bossier Country had struck before Riley decided to purchase the service contract.

[3]. Riley provided this testimony during questioning by counsel for Bossier Country. Counsel was asking Riley about several documents when Riley made this statement, and it is unclear to which document Riley was referring. Nevertheless, it was within the jury's discretion to conclude that Riley was referring to the installment contract.

amount to be financed before Riley decided to purchase the service contract.

Riley had purchased vehicles before so he was "somewhat" familiar with this type of transaction. However, he testified that he "possibly" did not understand all the paperwork.

Randy Pretzer testified that he has been managing partner for Bossier Country twelve years but has been in the business of selling automobiles longer. Pretzer demonstrated in his testimony that he has a thorough understanding of the various documents Riley signed on the date in question and of the effect of those documents.

■■■ Bossier Country first contends that Riley's claims are merely contract claims and are not actionable under the DTPA. A mere breach of contract is not actionable under the DTPA. *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 53 (Tex.1998); *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex.1996). In a DTPA suit which involves a contract, the totality of the circumstances surrounding the parties' dealings should be examined, taking in consideration all relevant factors including but not limited to:

- whether the representation was clearly factual, clearly interpretive, or some combination of the two;
- whether the relevant contractual language was ambiguous or unambiguous;
- whether the parties were in a substantially equal position of knowledge and information;
- Whether there was evidence of overreaching or victimizing;
- Whether there was evidence of unconscionable conduct; and

- Whether there was a confidential or fiduciary relationship between the parties.

*Adler Paper Stock, Inc. v. Houston Refuse Disposal, Inc.*, 930 S.W.2d 761, 765 & n. 4 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *W. Anderson Plaza v. Feyznia*, 876 S.W.2d 528, 533 (Tex.App.-Austin 1994, no writ); *accord Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex.1995) (court must consider "[t]he nature of the transaction and the totality of the circumstances surrounding the agreement" to determine whether "as is" clause defeats DTPA claim); *Bynum v. Prudential Residential Servs., Ltd. P'ship*, 129 S.W.3d 781, 788–89 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (same).

Here, the representations at issue involve Riley's right to cancel and whether DaimlerChrysler had approved financing for the transaction. The representation contained in the Conditional Sale and Delivery Agreement regarding Riley's right to cancel is "clearly factual" and is unambiguous. However, a reasonable juror could also infer from Riley's testimony that Bossier Country later made a verbal representation that his right to cancel continued even after he signed the installment contract. This verbal representation is "clearly interpretive" and renders the transaction ambiguous.

Regarding the parties' respective bargaining positions and their understanding of the terms of the transaction, a reasonable juror could readily infer that Bossier Country was in a superior position on both counts. Between the parties only Bossier Country knew when financing was actually approved for Riley.

The evidence that Bossier Country had Riley sign the installment contract before financing was actually approved would support a finding that Bossier Country engaged in unconscionable conduct.

Accordingly, we conclude that Riley's claims do not seek recovery for a mere breach of contract and are therefore actionable under the DTPA. *See Adler Paper Stock,* 930 S.W.2d at 765; *W. Anderson Plaza,* 876 S.W.2d at 533.

■ We now turn to the evidence pertinent to Riley's claim that Bossier Country made actionable misrepresentations. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(12). Riley testified that a Bossier Country representative told him financing had been approved that afternoon when he signed the retail installment contract. A reasonable juror could infer from the evidence that this representation was false because financing was not approved until later that evening.

Riley also testified that it was "specifically explained" to him that he could cancel the deal under the terms of the Conditional Sale and Delivery Agreement. He signed the installment contract "because I was told I was safe to back out of the deal," and a reasonable juror could infer from this testimony that a Bossier Country made this verbal representation to Riley at the time he signed the installment contract. With these representations in mind, Riley called Banks "the same afternoon" and "told him I had changed my mind about the deal." A reasonable juror could infer from the testimony that Riley did so before Bossier Country received approval of financing from DaimlerChrysler. When Riley decided to exercise this option however, Bossier Country failed to comply with the representations it had made regarding Riley's right to cancel.

For these reasons, we conclude that "the evidence at trial would enable reasonable and fair-minded people" to find that Bossier Country had made actionable misrepresentations. *See Valley Nissan, Inc. v. Davila,* 133 S.W.3d 702, 710 (Tex.App.-Corpus Christi 2003, no pet.); *Apple Im-*

*ports, Inc. v. Koole,* 945 S.W.2d 895, 898–99 (Tex.App.-Austin 1997, writ denied); *Gunn Buick, Inc. v. Rosano,* 907 S.W.2d 628, 631 (Tex.App.-San Antonio 1995, no writ).

The record contains conflicting evidence which we address in connection with Bossier Country's factual sufficiency challenge.

The evidence varies widely regarding when Riley signed the installment contract and the other documents intended to finalize the bargain. Thus, there is evidence in the record to support a finding that Riley did not sign these documents until after DaimlerChrysler approved financing. The question of when Riley signed these documents in relation to DaimlerChrysler's approval of financing required the jury to weigh the conflicting evidence and evaluate the credibility of the witnesses. We must defer to the jury's resolution of this disputed issue. *See Pulley,* 198 S.W.3d at 426–27; *Checker Bag,* 27 S.W.3d at 633.

The record contains conflicting evidence, including internal inconsistencies in Riley's own testimony, about the nature of the representations Bossier Country made regarding his right to cancel and when those representations were made. The record also contains disputed testimony regarding whether Riley tried to cancel the deal that same afternoon. Again, we must defer to the jury's resolution of these issues which turned on conflicting evidence and witness credibility. *Id.* Therefore, the record contains factually sufficient evidence to support a finding that Bossier Country made actionable misrepresentations.

Some of the evidence recited hereinabove also supports a finding that Bossier Country failed to disclose information which was known at the time of the transaction and intended by such failure to induce Riley to sign the retail installment

contract, which he would not have done had the information been disclosed. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(24).

A reasonable juror could infer from the evidence that financing was not approved until after Bossier Country had Riley sign the installment contract. A reasonable juror could also infer from the evidence that Bossier Country knew that financing had not yet been approved when Riley signed this contract, that Bossier Country failed to disclose this information so Riley would go ahead and sign the contract, and that Riley would not have signed the contract if he had known that financing had not yet been approved.

Accordingly, we conclude that "the evidence at trial would enable reasonable and fair-minded people" to find that Bossier Country failed to disclose information and intended by such failure to induce Riley to sign the retail installment contract. *See Lone Star Ford, Inc. v. Hill,* 879 S.W.2d 116, 119–20 (Tex.App.-Houston [14th Dist.] 1994, no writ).

The record contains conflicting evidence about when financing was approved and when Riley signed the various documents in his dealings with Bossier Country. Thus, resolution of the issue of whether Bossier Country failed to disclose information and intended by such failure to induce Riley to sign the retail installment contract required the jury to weigh the conflicting evidence and evaluate the credibility of the witnesses. We must defer to the jury's resolution of this disputed issue. *See Pulley,* 198 S.W.3d at 426–27; *Checker Bag,* 27 S.W.3d at 633. Accordingly, the record contains factually sufficient evidence to support a finding that Bossier Country failed to disclose information and intended by such failure to induce Riley to sign the retail installment contract. *See Lone Star Ford,* 879 S.W.2d at 119–20.

For these reasons, we hold that the record contains some evidence and factually sufficient evidence to uphold the jury's findings that Bossier Country made an actionable misrepresentation to Riley and failed to disclose information to him. Therefore, we overrule Bossier Country's first issue.

### Detrimental Reliance

■ Bossier Country contends in its second issue that there is no evidence or factually insufficient evidence that Riley relied to his detriment on any misrepresentation or failure to disclose information.

Riley must prove detrimental reliance to recover damages under the DTPA. TEX. BUS. & COM.CODE ANN. § 17.50(a)(1)(B) (Vernon Supp.2006); *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2003); *Daugherty v. Jacobs,* 187 S.W.3d 607, 615 (Tex.App.-Houston [14th Dist.] 2006, no pet.). He testified that he signed the installment contract "because I was told I was safe to back out of the deal." This is evidence that "would enable reasonable and fair-minded people" to find detrimental reliance.

Bossier Country directs our attention to evidence that Riley relied on his own unique interpretation of the right to cancel provided by the Conditional Sale and Delivery Agreement. It also references language in an "Addendum" to the MVPO which provides that "any oral agreement not reduced to writing will not be binding upon the dealership."

Such disclaimers render any prior oral representations unenforceable absent proof of fraud, accident, or mistake. *See Bossier Chrysler Dodge II, Inc. v. Rauschenberg,* 201 S.W.3d 787, 803 (Tex.App.-Waco 2006, pet. filed); *Balderson–Berger Equip. Co. v. Blount,* 653 S.W.2d 902, 908 (Tex.App.-Amarillo 1983, no writ). Here, Riley offered evidence that Bossier Coun-

try fraudulently persuaded him to sign the installment contract by falsely representing that financing had been approved and by failing to disclose otherwise. We have already determined that there is sufficient evidence to support a finding that Bossier Country made such misrepresentations. Therefore, the disclaimer does not vitiate the misrepresentations on which Riley testified he relied. *Id.*

Because the record contains some evidence and factually sufficient evidence to uphold the jury's finding of detrimental reliance, we overrule Bossier Country's second issue.

### Knowing Conduct

■ Bossier Country contends in its third issue that there is no evidence or factually insufficient evidence that it knowingly engaged in conduct that violated the DTPA.

Riley must prove that Bossier Country acted knowingly or intentionally to recover damages for mental anguish or treble damages. *See* Tex. Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon Supp.2006).

"Knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

*Id.* § 17.45(9) (Vernon 2002).

"Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a

person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway."

*St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 974 S.W.2d 51, 53–54 (Tex.1998); *Bossier Chrysler Dodge II,* 201 S.W.3d at 807.

Here, the record contains evidence that Bossier Country falsely represented to Riley that he could cancel the deal and that financing had been approved when Riley signed the installment contract. Bossier Country deals in countless transactions of a similar nature on a daily basis. Thus, a reasonable juror could infer that Bossier Country made these misrepresentations and failed to disclose that Riley had not yet been approved for financing with "actual awareness" that these representations were false.

As already discussed, there is evidence contradicting any finding that these representations were made or that they were false when made. We must defer to the jury's resolution of this disputed issue. *See Pulley,* 198 S.W.3d at 426–27; *Checker Bag,* 27 S.W.3d at 633.

Because the record contains some evidence and factually sufficient evidence to uphold the jury's finding that Bossier Country acted knowingly, we overrule Bossier Country's third issue.

### Damages Cap

Bossier Country contends in its fourth issue that the court erred by failing to cap the jury's award for mental anguish damages at three times the amount of economic damages awarded under section 17.50(b)(1) of the DTPA. However, Bossier Country misreads the statute.

Section 17.50(b)(1) provides that a DTPA plaintiff may recover:

the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

TEX. BUS. & COM.CODE ANN. § 17.50(b)(1).

■■■ Therefore, a prevailing plaintiff who establishes that the defendant acted "knowingly" can recover "economic damages," mental anguish damages, and additional damages of up to three times the amount of economic damages awarded.[4] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 50 Tex. Sup.Ct. J. 278, 279 (Tex. Dec. 22, 2006). The statute imposes no cap on the amount of damages the jury may award for mental anguish.

Therefore, we overrule Bossier Country's fourth issue.

### Interest

Bossier Country contends in its fifth issue that the court erroneously calculated prejudgment and postjudgment interest at the rate of 10% per annum. Riley agrees.

Under sections 304.003(c)(2) and 304.103 of the Finance Code, the appropriate rate of interest is 5% per annum for both pre-judgment and postjudgment interest. TEX. FIN.CODE ANN. §§ 304.003(c)(2), 304.103

(Vernon 2006); *see Hayhoe v. Henegar*, 172 S.W.3d 642, 645–46 (Tex.App.-Eastland 2005, no pet.). Therefore, we will modify the judgment to recite the correct rates of interest. We sustain Bossier Country's fifth issue.

We modify the judgment to recite the correct rates of prejudgment and post-judgment interest, and we affirm the judgment as modified.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.

Based upon a jury verdict, the trial court awarded James Riley $33,000 in past and future damages on his Deceptive Trade Practices Act cause of action against Bossier Chrysler–Dodge II, Inc. Bossier appealed. Because the evidence is legally insufficient to support the jury's affirmative answer to whether Bossier committed a deceptive act, we should reverse the trial court's judgment and render judgment that Riley take nothing.

### BACKGROUND

Riley visited Bossier, a Chrysler/Dodge dealership, to find a more fuel efficient vehicle to drive. Riley decided to make a deal on a PT Cruiser. He was going to trade in his pickup truck. Riley signed a conditional sale and delivery agreement and went home to retrieve the title to his pickup. The evidence is conflicting as to whether Riley drove the PT Cruiser or his pickup home. Riley returned with the title and signed the remainder of the paperwork, including a retail installment contract in which he agreed to purchase the PT Cruiser. Riley left Bossier to clean out his pickup. At some point after leaving

---

**4.** If the plaintiff establishes that the defendant acted "intentionally," the plaintiff can recover additional damages of up to three times not only the amount of economic damages award-ed but also the amount of mental anguish damages awarded. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 50 Tex. Sup. Ct. J. 278, 279 n. 6 (Tex., 2006).

the dealership for the last time, Riley decided he did not want to purchase the PT Cruiser. He never returned with the pickup or to take possession of the PT Cruiser.

## LEGAL AND FACTUAL INSUFFICIENCY

In its first issue, Bossier questions whether there is no evidence or alternatively, factually insufficient evidence to support any findings that Bossier (1) made a misrepresentation to Riley, or (2) failed to disclose information to Riley that was a producing cause of damages to him. In Question 5 of the court's charge, the jury was asked, "Did Bossier engage in any false, misleading, or deceptive act or practice on which James Riley relied to his detriment that was a producing cause of damages to James Riley?" The phrase false, misleading, or deceptive is defined in the charge as (1) "Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve or which are prohibited by law;" and (2) "Failing to disclose information concerning goods or services which were known at the time of the transaction and such failure to disclose was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed[.]"

In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 827, 48 Tex. Sup.Ct. J. 848 (Tex.2005). A no evidence point will be sustained when, among other reasons, there is a complete absence of evidence of a vital fact, or the evidence offered to prove a vital fact is no more than a mere scintilla. *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). Evidence does not exceed a scintilla if it is " 'so weak as to do no more than create a mere surmise or suspicion' " that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601, 47 Tex. Sup.Ct. J. 266 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)).

Riley's theory of the case, although not what was specified in his DTPA claim, was that, although he signed a retail installment contract, a previously signed conditional sale and delivery agreement allowed him to call off the deal. It is difficult to discern what evidence Riley believes is a misrepresentation or a failure to disclose. Riley makes no distinction between the two definitions of the phrase, "false, misleading, or deceptive." He also makes no distinction between Bossier's first and second issues which contest the sufficiency of the evidence of a false, misleading, or deceptive act (issue one) and reliance (issue two). Further, Riley makes no distinction between evidence which is legally sufficient and evidence which is factually sufficient. What Riley did in his brief and at trial was to dump out everything "bad" that happened to Riley in the hopes that someone would feel sorry for him, rather than proving up his counter-claim. It worked on the jury.

### MISREPRESENTATION

Bossier contends that it did not misrepresent any agreement to Riley. But Riley claims in his brief that Bossier misrepresented how the paperwork would function and induced him to sign numerous versions of the same document on the same date. Riley provides no citations to the record for this alleged misrepresentation. That is because there is no evidence in the record of a misrepresentation of how the paperwork would function. Riley also argues that Bossier represented that he would have all the rights to terminate

the sale if he was not approved for financing for 36 months at $326 a month. Again, Riley provides no citation to the record for this statement. The conditional sale and delivery agreement provides that if financing is not approved on the proposed terms, the buyer has no obligation to purchase the vehicle. The phrase "proposed terms" relates back to the terms described in the motor vehicle purchase order. There were no proposed financing terms on the motor vehicle purchase order. Thus, there is no evidence that the statement in the conditional sale and delivery agreement is a misrepresentation.

Riley further contends that the price of the vehicle induced him into thinking he could afford the vehicle and back out of the deal until he was approved for financing. There is no testimony that the price induced Riley to do anything. Riley claims in his brief that he took his pickup title to Bossier in reliance on a representation that Bossier would hold the PT Cruiser until Riley learned whether or not he would go back to work. There is no testimony of this reliance or representation. And Riley claims in his brief that the ultimate deceptive act was Bossier's faxed "threat" to Riley requesting him to bring in the pickup and informing him that Bossier would keep the PT Cruiser and leave Riley with no transportation. The fax was introduced into evidence but it is no evidence that Bossier represented that the fax was an agreement which confers or involves rights, remedies, or obligations which it does not have or involve or which are prohibited by law.

In our review of the record, there is no evidence that Bossier represented to Riley that the conditional sale and delivery agreement, or any other document, allowed Riley to call off the deal after the retail installment contract was signed.

## FAILURE TO DISCLOSE

But that is not the end of our inquiry. Bossier also contends that the evidence is legally insufficient to support the second definition of false, misleading, or deceptive act; that being, that Bossier failed to disclose information concerning goods or services which were known at the time of the transaction and such failure to disclose was intended to induce Riley into a transaction which Riley would not have entered had the information been disclosed.

Bossier argues it did not fail to disclose any information to Riley. But Riley argues in his brief that because he signed the retail installment contract before he was notified that he was approved for financing or that the terms of the financing had changed, Bossier failed to disclose information. The only evidence of when Riley was approved for financing was a fax from Chrysler Credit with the time of 6:02 p.m. on February 10. However, there is no evidence in the record that had Riley known at the time that he signed the retail installment contract that he had not yet been approved for financing, he would not have signed the contract. Further, there is no evidence that Bossier failed to disclose the financing terms. The terms were printed on the retail installment contract. And Riley presented no testimony that he did not know what the terms were or if he did not know, that had he known, he would not have signed the retail installment contract.

The only evidence Riley presented on this theory was that he would not have signed the retail installment contract had Bossier told him that he could not back out of the deal after signing it. Bossier informed him that after signing the conditional sale and delivery agreement, he could back out of the deal. But Riley claims Bossier did not inform him that he could not back out of the deal once he

signed the retail installment contract. Contrary evidence that a reasonable juror could not disregard is found in a comparison of the language of the two documents signed. The language of the conditional sale and delivery agreement sets out, in bold print, that "Buyer may cancel this agreement to purchase at any time prior to receiving the notification of approval of financing." No such language is found in the retail installment contract. In fact, the buyer is warned, in bold print, "Do not sign this contract before you read it or if it contains any blank spaces.... Buyer acknowledges receipt of a completely filled-in copy of this contract and agrees to all its terms." There is no evidence that Bossier failed to disclose to Riley that he could not back out of the retail installment agreement once it was signed.

Having determined that there was no evidence to support either definition of false, misleading, or deceptive act or practice, the evidence is legally insufficient to support the jury's affirmative finding that Bossier engaged in any false, misleading, or deceptive act or practice, and Bossier's first issue should be sustained. Further, this issue would be dispositive of this appeal, and we would not need to discuss the remainder of Bossier's first issue or Bossier's remaining issues.

### CONCLUSION

The trial court's judgment should be reversed and a judgment rendered that Riley take nothing. Because the majority holds otherwise, I respectfully dissent.

## OPINION DENYING REHEARING

FELIPE REYNA, Justice.

In this opinion denying Bossier Country's motion for rehearing, we address two of the six grounds raised in the motion: (1) this Court "overlooked admissions made by Riley" and other evidence which conclusively establish Bossier Country's entitlement to judgment on Riley's DTPA claims; and (2) this Court violated Bossier Country's rights to due process and due course of law by deciding the case on a theory "that was never pleaded [or] tried below." [1]

### Riley's "Admissions"

■■■ Bossier Country argued in its appellant's brief and argues in the motion for rehearing that testimony regarding Riley's "unique" interpretation of his right to cancel conclusively establishes Bossier Country's entitlement to judgment on the DTPA claims because this evidence establishes that Bossier Country did not make an actionable misrepresentation and that Riley did not rely on any representations made by Bossier Country.

On cross-examination, Bossier Country's counsel asked Riley what provisions of the various documents executed by the parties led him to believe that he had the right to cancel after Bossier got him the financing indicated in the installment contract and the second MVPO. Riley responded by observing that the Conditional Sale and Delivery Agreement specifically provides for a right to cancel by the Buyer (1) "at any time prior to receiving the notification of approval of financing" or (2) "[i]f financing is not approved on the proposed

1. Bossier Country also contends on rehearing that: (1) this Court erred by holding that a disclaimer in the Addendum to the MVPO is unenforceable; (2) this Court's rationale for upholding the jury's finding of a "knowing" DTPA violation "makes every violation of the DTPA in a motor vehicle purchase transaction a 'knowing' violation"; (3) this Court erred by holding that section 17.50(b)(1) of the DTPA does not set a cap on the amount of mental anguish damages that can be awarded for a knowing violation; and (4) this Court erred by assessing costs against Bossier Country.

terms." Riley disagreed with Bossier Country's counsel about whether he had the right to cancel after DaimlerChrysler made its financing decision only "if financing [was] not approved."

Bossier Country also refers to Riley's testimony that he continued to rely on the cancellation provisions of the Conditional Sale and Delivery Agreement after he signed the installment contract, "even after Bossier Country notified him that financing had been approved."

Finally, Bossier Country refers to the Rileys' long distance telephone bill from the pertinent time period as "irrefutable" evidence that Riley did not call Bossier Country to try to cancel until the next morning, after Bossier Country received written notification that financing had been approved.

The Conditional Sale and Delivery Agreement explicitly gave Riley the right to cancel (1) "at any time prior to receiving the notification of approval of financing" or (2) "[i]f financing [was] not approved *on the proposed terms*." (emphasis added) Riley testified that it was "specifically explained" to him that this document would allow him to back out of the deal.[2]

Bossier Country observes that Riley testified that he believed he still could back out "even though Bossier actually got you the financing" (in the words of Bossier Country's trial counsel). However, the financing actually approved by DaimlerChrysler differs from the terms Riley agreed to with the salesperson Jason Banks. Riley did testify that, when he returned and signed the installment contract, Bossier Country did "notify [him]

specifically that [he] had, in fact, been approved on those exact terms." Again however, "those terms" arguably are the terms reflected in the installment contract rather than the terms Riley had negotiated with Banks. Thus, the jury had to resolve a disputed fact issue regarding whether DaimlerChrysler ever approved financing for Riley at the terms he negotiated with Banks.

Regarding the moment when financing was approved, Bossier Country contends that the evidence conclusively establishes that financing was approved before Riley signed the installment contract because: (1) the undisputed evidence shows that Riley had a 6:00 p.m. appointment at Bossier Country which corresponds to the time when written approval of financing was received and which is necessarily the time Riley came in and signed the installment contract; and (2) the terms stated in the installment contract and the second MVPO, both of which list DaimlerChrysler as the lienholder, reflect the precise terms of financing which DaimlerChrysler approved.

The record contains conflicting evidence on this issue, however. Riley testified that he returned to Bossier Country only once that day, at mid-afternoon. Banks testified that Riley probably left after his second visit at 1:00 or 2:00 in the afternoon. No one testified that Riley kept the 6:00 appointment. Thus, a fact issue existed as to when Riley returned to Bossier Country and signed the installment contract.

Nor can we agree that the mere fact that the finance terms stated in the installment contract correspond exactly to the terms ultimately approved by Daim-

---

2. Bossier Country characterizes Riley's understanding of his right to cancel as a "unique and secret interpretation" of the Conditional Sales and Delivery Agreement. However, it appears from a careful review of

Riley's testimony that he was simply relying on the two alternative grounds for cancellation explicitly stated in this document and quoted hereinabove as the basis for his interpretation.

lerChrysler conclusively establishes that financing had been approved when the installment contract was prepared and presented to Riley for execution. Because Bossier Country did not receive written notification that DaimlerChrysler had approved financing until 6:02 p.m. and because there is evidence that Riley signed the installment contract several hours earlier, a fact issue existed regarding when DaimlerChrysler approved financing. And because a fact issue existed regarding when DaimlerChrysler approved financing, a fact issue necessarily existed concerning when (or if) Bossier Country accurately notified Riley that financing had been approved.

Finally, with regard to when Riley called to cancel the deal, Bossier Country contends that the Rileys' long distance telephone bill conclusively establishes that he did not do so until the following morning. Riley testified that he discussed the matter with his wife then called Bossier Country "the same afternoon" to cancel the deal. From this testimony, the jury could have inferred that Riley was home when he called, but the jury did not necessarily have to so infer. Moreover, the jury could have inferred that Riley used a different telephone or a cell phone. The jury could also have inferred that the Rileys' telephone bill was inaccurate. Accordingly, we cannot agree that their long distance telephone bill conclusively establishes that Riley did not call Bossier Country until the following morning to cancel the deal.

In summary, the record contains conflicting evidence about whether DaimlerChrysler ever approved financing for Riley on the terms he negotiated with Banks, when DaimlerChrysler actually approved financing, when or if Bossier Country accurately notified Riley that financing had been approved, and when Riley called Bos-

sier Country to cancel the deal. We must defer to the jury's resolution of these disputed fact issues. *See Pulley v. Milberger*, 198 S.W.3d 418, 426–27 (Tex.App.-Dallas 2006, pet. denied); *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied).

### Due Process/Due Course of Law

■ Bossier Country also contends that this Court violated Bossier Country's rights to due process and due course of law by deciding the case on a theory "that was never pleaded [or] tried below." Specifically, Bossier Country argues that "Riley neither pleaded nor proved that Bossier Country falsely represented, or failed to disclose, that financing had been approved when he signed the Retail Installment Contract, or that he detrimentally relied on any such representation."

Riley generally alleged the following DTPA violations in his counterclaim:

(1) Bossier Country "represented that an agreement conferred or involved rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"; and

(2) Bossier Country "fail[ed] to disclose information concerning goods or services which were known at the time of the transaction and such failure to disclose was intended to include [sic] the consumer into a transaction which the consumer would not have entered had the information been disclosed."

Bossier Country did not specially except to Riley's pleadings.

We have already recited the pertinent evidence. Riley's counsel, in her opening statement, highlighted the fact that the Conditional Sale and Delivery Agreement permitted Riley to cancel "if financing [was] denied on the proposed terms." In her closing argument, his counsel argued that Riley had the right to cancel because financing had not been approved on the

terms he agreed to and that Bossier Country made misrepresentations by having him sign the installment contract before financing was approved.

Therefore, we cannot agree that Riley failed to plead or prove "that Bossier Country falsely represented, or failed to disclose, that financing had been approved when he signed the Retail Installment Contract, or that he detrimentally relied on any such representation." Nor can we agree that Riley did not try his DTPA claims on this theory.

Bossier Country's motion for rehearing is denied.

Chief Justice GRAY, dissenting.

TOM GRAY, Chief Justice, dissenting opinion to opinion denying rehearing.

The majority's failure, like that of the plaintiff's, was and remains the careful analysis of evidence relevant to each cause of action. The majority's mantra on rehearing is the same tune we heard before. There is no reason to repeat it in another opinion. For the reasons expressed in my original dissenting opinion, which I otherwise feel compelled to not repeat again, again I dissent.